**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

RAYMOND J. EBEL,

      Petitioner,                                                  Case No. 05-CV-72540-DT
                                                                                          Honorable Arthur J. Tarnow

v.

BLAINE LAFLER,

      Respondent.
_____/

**OPINION AND ORDER DENYING
PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS**

**I. Introduction**

Petitioner Raymond Ebel, acting *pro se*, has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. He is currently incarcerated at the Riverside Correctional Facility in Ionia, Michigan, pursuant to convictions for criminal sexual conduct and breaking and entering. For the reasons stated, the Court denies Petitioner's writ of habeas corpus.

**II. Facts**

Petitioner's convictions were as a result of an incident that occurred on May 22, 1992. It was alleged that on that particular day, Petitioner broke into an apartment located in Niles Township, Berrien County, Michigan, with the intent to commit a felony, and that he did engage in sexual penetration of Christine Neff.

At trial, Ms. Neff testified that she had resided at the apartment with her two children and husband. On the night in question, Ms. Neff testified that her husband left for work around 10 p.m., and that she had been doing some laundry, going in and out of the third-floor balcony door.

Ms. Neff said that, at some point, she was watching television and had fallen asleep on the couch. She said that she woke up around 3:30 a.m. and went to her bedroom, leaving the television on. She set her alarm for 4 a.m., so that she could get up and finish the laundry before she went to work. When the alarm went off, she woke and pushed the snooze button several times and went back to sleep.

Ms. Neff testified that as she was attempting to go back to sleep, and while she was lying on her right side on the bed, she could sense that someone was in the room with her. It was her testimony that she was startled by someone kneeling next to her bed. Initially, Ms. Neff thought that it was her five-year-old daughter, because her daughter would frequently come into her bedroom and sleep with her. She then noticed that her daughter was already in the bed with her.

Ms. Neff testified that she then felt a man leaning over her, putting his left hand around her throat. The man told her not to move because if she did he would kill her and her daughters. It was Ms. Neff's testimony that when she went to bed that night the doors to the apartment were locked. She also testified that her bedside alarm kept going off and she reached over several times to shut it off so that her daughter would not wake up.

Ms. Neff remained in bed, with her daughter along side her, when the man proceeded to spread her legs apart, hitting the inside of her legs. As he climbed onto the bed with her, "he started to proceed with oral sex and he told me to put my butt up in the air is what he said." Subsequently, Ms. Neff said that he then inserted his penis into her vagina, and that while he was having intercourse with her, he stated "[a]ll I want is to get off and I'll leave." *Id.* Ms. Neff said that she could smell an odor of alcohol coming from the man. She could feel that he was wearing jeans and no shirt at the time of the incident. According to Ms. Neff's testimony, during

the whole time of the attack, her daughter remained in the bed.

At trial, Ms. Neff testified that when the man was done, he left the apartment through the sliding glass doors. When he left, she immediately got up and looked out the window; she saw him drive off in a car, but could not identify what kind of car. Ms. Neff then said that she noticed that there was some money missing from the apartment. Her husband had left some money on the bookcase so that she could pay the rent.

Immediately afterward, Ms. Neff called 911. Officer Wallace Lee Casto was the first officer to arrive at the scene. When he arrived, he noted that Ms. Neff was visibly shaken. Officer Casto then called for assistance. He spoke with Ms. Neff, discovering what had transpired and then he took her to the hospital, where she was examined. Ms. Neff could not specifically identify the perpetrator.

Several days after the alleged incident, the police requested that Ms. Neff write out what had happened. In that letter, she said that she was not sure if the sliding door was locked.

Ms. Neff's daughter, Alexis, testified that she remembered being present on the night in question, and that she initially went to her bedroom to go to sleep, but later went to her mother's room, which was not uncommon for her to do. She testified that she later remembered waking up and feeling with her leg a person in the bed next to her, with jeans on, smelling of vinegar. She remembered her mother holding her tightly, telling her to be quiet. She also remembered her mother calling the police and saying that some money had been taken from the apartment.

Petitioner testified on his own behalf. He said that he had met Ms. Neff at a bar on the night of May 22, 1992, and that she invited him back to her apartment. He said that they entered her apartment through the sliding door. Petitioner admitted having sex with Ms. Neff, and that

3

before they had sex, they had smoked some marijuana in her bathroom. While they were in the bathroom, Petitioner said that Ms. Neff's daughter came in and saw them. Ms. Neff then left the bathroom with her daughter, taking her back to her bedroom. When Ms. Neff returned, they went into her bedroom and had sex. Petitioner testified that afterward they both fell asleep. He admitted to taking the money as he was leaving the apartment. Petitioner testified that he left the apartment the same way that he had entered. Petitioner denied the allegations as testified to by Ms. Neff.

When defense counsel had cross-examined Ms. Neff, she denied ever having been with Petitioner at a bar, and said that she did not invite him over to her apartment. She admitted suing the apartment complex, because, prior to the incident in question, she had asked for a deadbolt lock and the complex had refused. Ms. Neff testified on cross-examination that, during the civil lawsuit, an expert gave testimony, demonstrating how to open the sliding doors, locked or not locked.

Officers Jeffrey Dunlap and Tim Gray assisted Officer Casto at the scene. They testified that they checked the premises for fingerprints (none could be lifted) and collected bedding from the area of the alleged incident. They reported that there were no signs of a forced entry.

Officer John Gordon Street was the police officer assigned to investigate the case. He did so for about one year after the alleged incident to no avail. And, because Officer Street felt that the crime was such a vicious crime, he kept the file in his office for about three to four years. Then, in February 2001, the Michigan State Police sent out a flyer indicating that they were now conducting DNA testing. Because the case was unsolved, Officer Street testified that he sent evidence from the rape kit of Ms. Neff to be tested.

4

That evidence was checked against the Michigan state database, which proved negative. However, a second check with the national database was positive, locating a possible suspect in the State of Indiana. Officer Street testified that he then went to Indiana and spoke to the possible suspect, the Petitioner in this case.

An arrest warrant was issued for Petitioner on October 18, 2001. Petitioner was not extradited to Michigan until October 3, 2002.

### III. Procedural History

Petitioner was convicted, following a jury trial, of two counts of first-degree criminal sexual conduct ("CSC I"), M.C.L. 750.520b(1), and breaking and entering with intent to commit a larceny, M.C.L. 750.110, in the Wayne County Circuit Court. The trial court sentenced Petitioner to serve concurrent terms of life for one count of CSC I, four years to life for the other count of CSC I, and ten to twenty-two and one half years for breaking and entering. Petitioner was additionally charged as a fourth habitual offender, M.C.L. 769.12.

Petitioner, through counsel, filed an appeal with the Michigan Court of Appeals, raising the following issue:

> I. Is Defendant-Appellant entitled to re-sentencing where a sentence imposed was in violation of the indeterminate sentencing statute?

Petitioner also filed a *pro se* brief raising the following two claims:

> I. Did the trial court abuse its discretion in refusing to grant several mistrial motions that had prejudicial effects on the jury's verdict, which denied the defendant his V and XIV rights of due process and fair trial?
>
> II. Was the defendant's constitutional rights of the V, VI, and XIV Amendments violated by a limitation on the prosecution to file an indictment?

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Ebel*, No.

249862, 2004 WL 2913666 (Mich.App. Dec. 16, 2004) (unpublished). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, raising the same issues as raised on direct review to the Michigan Court of Appeals. The Michigan Supreme Court denied leave on May 31, 2005. *People v. Ebel*, 472 Mich. 919, 696 N.W.2d 714 (2005).

Petitioner filed the pending petition for a writ of habeas corpus on June 27, 2005, asserting the same issues as in both state appellate courts. Respondent filed its answer on January 18, 2006, stating that the Michigan Court of Appeals' decision, the last court to issue a reasoned decision in this case, was not an unreasonable application of, or contrary to, federal law.

### IV. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

6

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

Petitioner must therefore demonstrate that the Michigan Court of Appeals' decision was contrary to or involved an unreasonable application of existing federal law.

## V. Analysis

### A.

Petitioner first contends that the trial court abused its discretion in refusing to grant several defense mistrial motions, which resulted in prejudicial effects on the jury's verdict, and thereby, denied Petitioner his due process rights to a fair trial, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Petitioner's claim is divided into three separate allegations.

First , Petitioner claims that Officer Street's testimony, regarding the case, that he kept it open so long because he viewed it as a "very vicious case," rendered his trial unfair. Second, Petitioner contends that the jury was unfairly informed or left to understand that, because the authorities had Petitioner's DNA profile in their database, it meant that he must have previously been convicted of a serious sex offense. Finally, Petitioner argues that the testimony from a police officer that he (Petitioner) did not want to talk any further with the police violated his *Doyle* rights. *See Doyle v. Ohio*, 426 U.S. 610 (1976).

7

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, decided Petitioner's claim on the merits as follows:

> Finally, defendant argues that the trial court erred in declining to grant motions for a mistrial. This Court reviews a lower court's decision on a motion for a mistrial for an abuse of discretion. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant, and impairs his ability to get a fair trial." *Id.* (citations omitted).
>
> Defendant first makes issue of police testimony describing the instant crimes as constituting "a very vicious case." There was no objection at that time, but later defense counsel requested a mistrial on the ground that this testimony was highly prejudicial. The trial court denied the motion, but instructed the jury "to disregard any characterization of this alleged offense," and reminded the jury that its "consideration has to be based upon the facts and the evidence as you determine those to be, and the opinion of one person about what is or what is not an offense, that was his opinion and you're to disregard that." Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Because the witness' depiction was a fair characterization of the evidence, and because the trial court admonished the jury to disregard it, reversal is unwarranted.
>
> Defendant next argues that a mistrial was warranted because the jury learned that the police identified him as a suspect by matching his DNA to a database available to them. A specialist in the area described ths state DNA database as one "of convicted offenders." There was no objection at the time, but later, when the jury was out of the courtroom, defense counsel requested a mistrial, on the ground that it is commonly understood that such databases track only persons implicated in criminal activity. Defense counsel additionally compounded the potential prejudice, having himself mentioned in opening statements that defendant had been in prison. In denying the motion, the trial court observed that there was no implication that any earlier conviction on defendant's part involved criminal sexual conduct and that the court had instructed the jury that how defendant's information came to be in a DNA registry was not relevant to the instant crime. Assuming that defense counsel's reference, during opening statements, to defendant's imprisonment did not constitute waiver

> of this issue, there was little emphasis on defendant's earlier
> incarceration and no indication what crimes might have given rise
> to it; therefore reversal is unwarranted.
>
> For his final argument, defendant points out that defense
> counsel objected to allowing a police witness to testify that when
> he confronted defendant about the crimes, defendant indicated that
> he did not wish to talk further. A defendant's assertion of the right
> to remain silent may not be used as substantive evidence of guilt.
> *People v Bobo*, 390 Mich 355, 361; 212 NW2d 190 (1973).
> However, this discussion took place outside the presence of the
> jury. When proceedings resumed the next day, the prosecutor
> indicated that he would not try to admit defendant's statement.
> Defendant fails to show that this subject matter ever came to the
> jury's attention.

*People v. Ebel*, No. 249862, slip op. at 3-4.

### 1. Officer Street's Testimony

A reading of the record shows that, in his testimony, Officer Street explained to the jury why he kept the case open for so long–cases were kept open because of the new technological advances that were occurring which could possibly help the police solve the crime, and he believed it was a "vicious crime." After receiving notification that Michigan was now able to do DNA testing, Officer Street submitted the DNA from Ms. Neff for analysis. Defense counsel objected to Officer Street's testimony, and the trial court immediately stated that it would give a cautionary instruction to the jury.

> And, the second thing that I want to talk to you about is
> yesterday during Chief Street's testimony he characterized this–the
> alleged offense here as being a–I think in his words, a vicious rape,
> and trying to convey to you why he continued to kind of hang onto
> the file and the case.
>
> I'm going to instruct you that you are to disregard any
> characterization of this alleged offense. That's not to remain to
> your considerations. Your consideration has to be based upon the
> facts and the evidence as you determine those to be, and the

9

> opinion of one person about what is or what is not an offense, that was his opinion and you're to disregard that . . . .

(Trial Tr. Vol. II, pp. 277-278.)

In *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), the United States Supreme Court stated that "[t]he rule that juries are presumed to follow their instructions is a pragmatic one." *Id. See also Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) (we presume that juries follow their instructions). This Court finds that, given the fact that the trial court gave an appropriate cautionary instruction to the jury soon after the disputed testimony, there is no overwhelming probability that the jury was substantially prejudiced. Therefore, the Michigan Court of Appeals' decision with respect to this issue was not contrary to, or an unreasonable application, of clearly established Supreme Court precedent.

## 2. DNA profile issue

With regard to the second allegation, the trial court permitted the jurors to pose questions to the witnesses by way of notes to the trial court. During the testimony of the DNA expert, the jurors asked the question as to how one's DNA profile would end up on the national database. The trial court responded:

> There are numerous questions here of Mr. Wolfarth regarding how a person's DNA would end up in the database that is state and national.
>
> That–there are–without cutting into his expertise, but by stipulation, there are numerous ways that a person's DNA may be entered into either a state, local, or national database, and it's not relevant to this proceeding how that happened to get there.
>
> The question that you have–one of the questions that you have to decide is whether or not, based upon this expert testimony and the exhibits admitted, as to whether or not the DNA that were processed that was run in this case was a valid one, and secondly, whether or not it was the defendant's DNA that matched.

> How that got into the –this database is clearly irrelevant to this proceeding. It doesn't make any difference, because there are numerous ways and it's not–he may not even know.

(Trial Tr. Vol. II, pp. 305-306.)

The trial court also took extra precautionary measures and instructed the jury that Petitioner had not been previously convicted of a sex crime. Thus, any potential prejudice to Petitioner was cured by the trial court's specific instruction to the jury to not consider how Petitioner's DNA found its way into the database and that he had not been previously convicted of a sex offense.

### 3. *Doyle* rights issue

Finally, Petitioner contends that Officer Street made reference to his (Petitioner's) failure to make a statement. The trial court held a *Walker* hearing, out of the presence of the jury, to determine the admissibility of Petitioner's statements to the police. At the hearing, Officer Street testified that at some point Petitioner stated that he did not wish to make any further statements. The trial court ruled that certain portions of the statement would be admissible, however, the prosecutor never re-called Officer Street to the stand to testify as to Petitioner's statements or lack of statements to the police. Thus, even if this Court were to consider that error, Petitioner has failed to demonstrate that, had this not occurred, the result of his trial would have been more favorable to him. *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999).

On that basis, there was no unreasonable application of federal law by the state appellate court. Accordingly, Petitioner is not entitled to habeas relief with respect to this claim.

### B.

In his second claim, Petitioner alleges that the Michigan Court of Appeals unreasonably applied Michigan law in his case because the charges filed against him were filed outside Michigan's six-year statute of limitations, and therefore violated his rights under the Fifth, Sixth and Fourteenth Amendments.

The Michigan Court of Appeals, the last state appellate court to issue a reasoned decision on this claim, stated:

> Defendant *in propria persona* argues that he was invalidly charged with breaking and entering several years after the six-year statute of limitations for that offense had run. MCL 767.24(4).[1] There is no dispute that the crime in question took place in May 1992 and that defendant was named in a complaint and warrant in October 2001; he was bound over for trial in October 2002.
>
> Defendant fails to indicate whether or where this issue was raised below. "It is well established in Michigan that a statute of limitations defense, MCL 767.24, in a criminal case is a nonjurisdictional, waivable affirmative defense." *People v Burns*, 250 Mich App 436, 439; 647 NW2d 515 (2002). This Court's review is thus limited to ascertaining whether there was plain error affecting substantial rights. *Carines*, *supra*.
>
> MCL 767.24(5) provides that "[a]ny period during which the party charged did not usually and publicly reside within this state is not part of the time within which the respective indictments shall be found and filed." Defendant's presentence investigation report states that defendant has spent much of the last decade incarcerated in the Indiana Prison System, released just long enough to violate and return to prison for new crimes committed." The report continues,"It appears that [the instant sexual assaults] took place while the defendant was just out of prison and residing in the community."
>
> Because this defense was not raised below, and indications are that defendant has resided in Indiana, not Michigan, since the

---

[1]There is no time limitation on prosecutions for first-degree criminal sexual conduct. M.C.L. 767.24(1).

> crimes took place, defendant has not shown that failure to dismiss pursuant to the statute of limitations was plain error or affected his substantial rights.

*People v. Ebel*, No. 249862, slip op. at 2-3.

Violations of state law and procedure which do not infringe on specific federal constitutional protections are not cognizable claims under § 2254. *Estelle v. McGuire*, 502 U.S. 62, 67-68. A state court's failure to properly apply a state statute of limitations does not violate due process or any other provision of the Constitution or a federal statute, and therefore does not provide a basis for granting a writ of habeas corpus. *Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000); *see also Wilson v. Mitchell*, 250 F.3d 388, 396-397 (6th Cir. 2001). Petitioner's claim that the applicable statute of limitations had run when he was charged with the crimes is thus non-cognizable in this habeas corpus proceeding, because it is an issue of state law. *Burns v. Lafler*, 328 F.Supp.2d 711, 719 (E.D. Mich. 2004) (Gadola, J.).

To the extent that Petitioner is claiming that his due process rights were violated by the delay in charging him with these offenses, this claim is also without merit. The due process inquiry must consider the reasons for the delay as well as prejudice to the accused. *United States v. Lovasco*, 431 U.S. 783, 790 (1977). The Sixth Circuit has consistently read *Lovasco* to hold that dismissal for pre-indictment delay is warranted only when the defendant shows: (1) substantial prejudice to his right to a fair trial; and (2) that the delay was an intentional device by the government to gain a tactical advantage. *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992). To prosecute a defendant following an investigative delay does not deprive him of due process, even if his defense is somewhat prejudiced by the lapse of time. *Lovasco*, 431 U.S. at 796.

13

Petitioner's due process argument fails for several reasons. First, Petitioner has failed to offer any evidence that the delay in charging him was an intentional device used by the prosecution to gain a tactical advantage over him. The events of the case did not unfold until Officer Street received a flyer from the Michigan State Police notifying the police department that the State was now able to do DNA testing. After receiving that information, Officer Street sent the preserved evidence from this case to the appropriate lab to be tested. When the results came back negative, Officer Street then sent the evidence to the national database, which in turn came up with a positive match, that of Petitioner.

Hence, the prosecutor did not file charges until October 18, 2001. However, because Petitioner was in the Indiana Prison System on an unrelated charge, it took approximately one year to extradite him to the State of Michigan. Petitioner was returned on October 3, 2002, and was tried on April 9, 2003. A six-month delay is not presumptively prejudicial. *Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) (eight months). Under the circumstances, Petitioner is unable to establish that the delay was
intentionally done to obtain a tactical advantage. *Monzo v. Edwards*, 281 F.3d 568, 581-582 (6th Cir. 2002).

Second, Petitioner has failed to demonstrate that he was substantially prejudiced by that delay. Petitioner testified in his own defense, giving his side of the story.

Finally, Petitioner has failed to indicate what evidence was lost to the defense because of the delay and has thus failed to establish a due process violation.

On that basis, there was no unreasonable application of federal law by the state appellate court. Accordingly, Petitioner is not entitled to habeas relief with respect to this claim.

## VI. Conclusion

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.

Accordingly:

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH PREJUDICE**.


s/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated: May 31, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 31, 2007, by electronic and/or ordinary mail.

s/Catherine A. Pickles
Judicial Secretary